[S. F. No. 16732.  In Bank.  Nov. 2, 1942.]

C. A. ROY, Respondent, v. RAYMOND SALISBURY, as Executor, etc., Appellant.

Raymond Salisbury in pro. per., and Joseph C. Prior for Appellant.

Fitzgerald, Abbott & Beardsley and Milton W. Dobrzensky for Respondent.

CARTER, J. — Defendant, as executor of the estate of Edward S. Drucks, deceased, appeals from a money judgment in favor of plaintiff upon a rejected probate claim.

Plaintiff, the owner of the Palanka Kennels and a breeder and trainer of Doberman Pinscher dogs, sold a pup of that breed named Mike to the decedent, Dr. Drucks. It appears that decedent had a great affection for Mike and employed plaintiff to train him. Decedent knew that plaintiff's usual rate for boarding and caring for Doberman Pinschers was $20 per month, having paid that amount to plaintiff for keeping Mike on several occasions. The trial court found that the oral contract between decedent and plaintiff, which is the basis of plaintiff's claim against decedent's estate, was as follows:

"That if said Drucks ever became unable to care for said dog, or, if he should die, he had arranged that said "MIKE" would be delivered to plaintiff to be housed, fed and cared for by plaintiff for the remainder of said dog's life, at plaintiff's usual rate for housing, feeding and caring for such dogs, viz., at the rate of $20.00 per month, which said sum said Drucks promised and agreed to pay, payable at the end of each month, and that said dog was neither to be sold nor exhibited by plaintiff." On December 30, 1938, decedent being ill was taken to the hospital. Mike was de-

livered to plaintiff's kennels, and ever since said date has been kept and cared for by plaintiff according to the terms of the contract. Decedent returned to his home on January 5, 1939, and died on January 9, 1939. On December 30, 1938, Mike's life expectancy was eight years; the rate of $20 per month applied to that period of time equals $1,920. Plaintiff's claim against the estate being rejected, he commenced this action and judgment was entered therein on January 20, 1941, awarding him $480 for the period from December 30, 1938, to December 31, 1940. With respect to the remainder of Mike's life expectancy the sum of $1,440 was awarded which was to be paid at the rate of $20 per month on the last day of each month commencing in January, 1941, or that defendant executor "pay into court a sum of money sufficient to meet the monthly installments of $20.00 each for the housing, feeding and caring for said dog 'MIKE' during the lifetime of said dog, accruing between the 31st day of December, 1940, and the expiration of said life expectancy of said dog 'MIKE,' as found herein, viz., eight years after December 31, 1938, or a total of $1,440.00, the sum of $20.00 to be paid over to plaintiff on the last day of each and every month during the lifetime of said dog 'MIKE,' commencing with the month of January, 1941, and continuing during the lifetime of said dog 'MIKE' until the said sum of $1,440.00 has been fully expended."

Disregarding conflicts there is sufficient evidence to support the findings with respect to the existence of the contract. One of plaintiff's employees testified that in June or July, 1938, decedent called at plaintiff's kennels and stated to plaintiffs: " 'My health is failing. In the event anything should happen to me or I should die, Mike will be brought to the kennel and I want him to stay here and be taken care of and be fed, not to show him and not to work or not to sell him,' and Mr. Roy (plaintiff) said, 'Yes, I will do that.' " The same witness related other conversations in which decedent stated that he wanted to be sure Mike would be cared for and a few days after Thanksgiving "The Doctor came in and he was crying. He says, 'I come back from the cemetery.' He said, 'It will be my last visit,' and Mr. Roy said, 'Doctor, you will be all right, you will get well.' Doctor Drucks said, 'I know better. I didn't come here for sympathy or charity. It is strictly business,' and he said, 'so the agreement about Mike still stands,' and they shook hands on it." Mr. Bollinger testified that decedent had said he was making

arrangements for Mike's care if he was unable to care for him. Mrs. McIntosh testified that the decedent told her he had made arrangements with plaintiff to care for the dog "in case the Doctor was unable to take care of him or in the event of his death." Mr. McIntosh testified substantially to the same effect. There is evidence that after decedent had purchased Mike, he had paid $20 per month for his care by plaintiff.

With regard to the commencement of performance under the contract, Mr. Repose, a friend of decedent, testified that the latter told him "if anything happened, that Roy (plaintiff) would take care of the dog and to take the dog out to the kennels there and that Roy would look after the dog." Repose occasionally attended to the dog for decedent. At the time decedent was taken to the hospital he had been bed-ridden for five days, and Mabel Hanavan, a close friend of decedent's who was at his home, told Repose to take Mike to plaintiff's kennels. That was done. Decedent spoke of the dog after he returned from the hospital, but it appears nowhere that he requested that Mike be brought home. As far as appears, no other arrangement existed between plaintiff and decedent in regard to the taking of Mike to the kennels or for his care. These circumstances were sufficient to justify the inference that when Repose delivered the dog to the kennels it was in accordance with decedent's request, and was pursuant to the terms of the latter's contract with plaintiff. Decedent's physical condition coupled with his removal to the hospital created a situation where he was unable to care for Mike, and having made no other arrangement in respect to the care of the dog, it may be assumed that the delivery of the dog to the kennels was in accordance with his agreement with plaintiff. It is reasonable to infer that decedent knew Mike was at the kennels during the time he was home after returning from the hospital and at the time of his death, inasmuch as he was very much attached to the dog and discussed it during that time. So far as the record discloses he made no comment in regard to Mike's absence.

Defendant urges that the contract was unenforceable because it was not in writing, and came within the statute of frauds providing that an agreement which by its terms is not to be performed during the lifetime of the promisor must be in writing. (Code Civ. Proc., § 1973(6); Civ. Code, § 1624(6).) In that connection he claims that the contract

contemplated by the parties was one in which plaintiff was to board Mike *only* in the event of decedent's death and refers to evidence that decedent spoke of approaching death in the transactions forming the basis for the contract. But it should be noted that witness Bollinger, after testifying that decedent had said that if he were unable to care for the dog he wanted it cared for at a proper place, also testified: Q. "When he said that you don't know what he (decedent) was referring to when he said he was unable, whether it was sickness, death or going away from here? A. *He was referring to his ill health.* He didn't say anything about expecting to die. He said he was in ill health and making arrangements with Mr. Roy if he was unable to take care of the dog." The evidence from several witnesses was to the effect that the dog was to be boarded if the decedent was unable to care for it *or* should die. It thus appears that decedent had two contingencies or alternatives in mind as stated in the contract found by the court to exist, namely, that the dog was to be boarded by plaintiff if decedent should die, or if he were unable to care for it because of illness. It is appropriate to observe at this point also that defendant contends that the contract is fatally uncertain (discussed later herein). If that be true then section 1654 of the Civil Code is pertinent. It provides: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party."

One of the preceding rules to which reference is made is that "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Civ. Code, § 1649.) Merely because decedent spoke of impending death in connection with the transaction does not necessarily establish that the contingency of death only was the sense in which decedent believed that plaintiff understood the promise. We have therefore the contract with the two alternatives as found by the court.

▮ With that in mind we turn to the issue of the statute of frauds. There are several rules applicable to this case which will support the judgment. Conceding that if the sole provision of the contract was for the care of the dog in the event of decedent's death, it would be a contract not to be

performed during the lifetime of decedent promisor, and therefore condemned by the statute of frauds (see *Hagan v. McNary,* 170 Cal. 141 [148 P. 937, L.R.A. 1915E, 562]); but we have seen that death was not the sole alternative. If the terms of a contract are such that it admits of performance during the lifetime of the promisor, it is not within the statutory provision here involved. That conclusion follows by analogy from the accepted interpretation of the statute of frauds provision that a contract that ''by its terms is not to be performed within a year'' must be in writing. (Code Civ. Proc., § 1973(1); Civ. Code, § 1624(·1).) It is to be noted that the wording of the two provisions is identical except as to the period of time involved. An oral contract which is capable of being performed within a year is not condemned by the statute or, as recently stated by this court in *Hollywood M. P. Equipment Co.* v. *Furer,* 16 Cal.2d 184, 187 [105 P.2d 299]: ''It is well settled that oral contracts invalidated by the statute because not to be performed within a year include those only which *cannot* be performed within that period. (2 Williston on Contracts, Revised Edition, § 495, p. 1441.) Even though a promise may not by its terms be performed within a year, yet it is not inhibited by the statute if there is a possibility that it may be. The contract itself must contain language whose reasonable interpretation shows a clear intention that it cannot be performed within the year. It is subject of proof unless by its terms it is incapable of performance within said period.'' (See, also, 12 Cal.Jur. 857.) Manifestly the contract here in question could be performed within the lifetime of decedent. If he became unable to care for Mike during his lifetime, the contract would be performable and the performance might be completed before his death because the dog might die before decedent, thus requiring no further care and the contract would have been completely performed. It was stated in *Gaskins* v. *Security-First Nat. Bank,* 30 Cal.App.2d 409, 418 [86 P.2d 681], involving a contract with the guardian of an incompetent to care for the latter's minor children with reference to section 1624(1):

''It could also be said that even assuming the contract with the original guardian was not in writing, its performance was not by its terms postponed beyond one year. In the case at bar the contract was to care for the minor children of the incompetent during their minority, with payment to be made when the youngest attained majority. Obviously

such a contract might be fully performed in one year from the date of its execution, as, for instance, would be the case should all the minor children have died within the first year.'' (See also 27 C. J. 184.)

However, defendant contends that if a portion of an oral contract is invalid because within the statute of frauds the entire contract is unenforceable, citing *Fuller* v. *Reed,* 38 Cal. 99, and that here the agreement to have the dog cared for in the event of decedent's death was inseparable from the term that similar care was to be given if decedent was unable to care for the dog.'That rule cannot have any application here because even if the alternatives upon which the dog was to be boarded, that is, death or inability to care for the dog are treated as inseparable and indivisible, still the contract could be performed during decedent's lifetime. If decedent became unable to care for the dog before his death and it was boarded by plaintiff but died before the death of decedent, there would be no further performance required, and the provision with regard to the contingency in the event of death would never become operative. Where one part of a contract is capable of performance within the time specified, and thus not within the statute, and such performance may constitute also a performance of the other part of the contract which is within the statute, then the contract may not be condemned. Furthermore, where a contract contains two promises which are in the alternative, rather than being merely divisible, one of which is within the statute of frauds and the other not, recovery may be had for a breach of the latter. (See *Ward* v. *Ward,* 94 Colo. 275 [30 P.2d 853] ; *Canister Co.* v. *Wood & Selick, Inc.,* 73 F.2d 312, certiorari denied, 296 U.S. 590 [56 S.Ct. 101, 113, 80 L.Ed. 417] ; 25 R.C.L. 703 ; 27 C.J. 318.) The contract in question stipulates that ''if said Drucks ever became unable to care for said dog, *or,* if he should die'' Mike would be delivered to plaintiff for boarding, ''for the remainder of said dog's life.'' Obviously, the promises were in the alternative and in no event was the contract to extend beyond Mike's life. Decedent's affection for Mike and the other circumstances herein narrated indicate that he desired that Mike's welfare be safeguarded if he were unable to give that protection himself. All decedent desired would be accomplished by said contract if he became unable to care for the dog before his death, and that inability continued as it

184

did in the instant case up to his death and thereafter, as the result of his death during the lifetime of the dog.

■ Defendant contends that the contract is fatally uncertain, referring particularly to the clause "If said Drucks should become *unable* to care for said dog." That position is untenable. ■ It is a fundamental principle as stated in *McIllmoil* v. *Frawley Motor Co.*, 190 Cal. 546, 549 [213 P. 971]:

" 'The law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained.' " (See, also, Civ. Code, § 1653; *Sutliff* v. *Seidenberg, S. & Co.*, 132 Cal. 63 [64 P. 131, 469]; *Meyers* v. *Nolan*, 18 Cal.App.2d 319 [63 P.2d 1216]; *Pease* v. *Lindsey*, 129 Cal.App. 408 [18 P.2d 717]; *Noble* v. *Reid-Avery Co.*, 89 Cal.App. 75, 79 [264 P. 341].) Also, adverting to section 1654 of the Civil Code, in cases of uncertainty not removed by the rules stated in sections 1635 to 1653 of that code, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist, and the promisor is presumed to be such party. ■ From decedent's affection for the dog and his discussion of his illness in connection with the transaction together with the testimony of Bollinger heretofore mentioned that the decedent had illness in mind with reference to the care of the dog, the trial court was justified in concluding that the inability contemplated was physical incapacity. Not only was the decedent bedridden and in no condition to care for the dog, but he was taken to the hospital when Mike was taken to the kennels:

■ We have heretofore pointed out that the evidence was sufficient to establish that Mike was delivered to the kennels under the terms of the contract. That being true the parties by their own conduct have placed the interpretation on the contract that the illness of decedent constituted the inability therein mentioned and removes any question of uncertainty. The construction placed upon a contract by the parties is persuasive and the law recognizes that the practical construction made by them is cogent evidence of their intent. (*Long Beach Drug Co.* v. *United Drug Co.*, 13 Cal.2d 158 [88 P.2d 698, 89 P.2d 386].)

In connection with his claimed uncertainty, defendant urges that the impounding of funds under section 953 of the Probate Code for the payment of immatured or contingent claims

is an equitable proceeding, that therefore the judgment here providing for such impounding is in effect requiring specific performance of the contract, and that the rules in specific performance cases with respect to uncertainty in contracts are applicable. That reasoning is extremely doubtful to say the least, but in any event, as we have seen, the contract here is not fatally uncertain.

The contract upon which plaintiff's judgment is based was the community property of the plaintiff and his wife, Elizabeth. After the contract was made, the dog was delivered to the kennels, and six months after decedent's death, Elizabeth executed the following instrument:

"July 8, 1939. In consideration for the sum of . . . $1 to me in hand paid by my husband C. A. Roy, I hereby agree that the claim against the Estate of Edward S. Drucks (No. 71031 Alameda Co.) on account of the Doberman dog 'Mike' and all proceeds thereof is the separate property of my husband, C. A. Roy. (Signed) MRS. ELIZABETH ROY.
Wife of C. A. Roy.''

At the trial Mrs. Roy testified, over defendant's objection (his motion to strike was also denied), that decedent acquired Mike from plaintiff and he was trained at the kennels; she also testified as to the amount paid for such training, and the conversation on which the contract between decedent and plaintiff was based. Defendant urges that Mrs. Roy was incompetent as a witness under Code of Civil Procedure section 1880(3) providing that a person cannot be a witness who is a party or assignor of a party to an action, or person in whose behalf an action is prosecuted against an executor upon a claim or demand against the estate of a deceased person as to any matter or fact occurring before the death of decedent. It is contended that by virtue of the above instrument, Mrs. Roy was the assignor of her community property interest in the rights under the contract. We believe that the case of *Perkins* v. *Sunset Tel. & Tel. Co.*, 155 Cal. 712 [103 P. 190], is controlling on this proposition. There plaintiffs, husband and wife, prosecuted an action for a personal injury to the wife. The court found that plaintiffs had an agreement *prior* to the accrual of the personal injury action that all community property then held or thereafter acquired would be the wife's separate property and that *after* the

action had accrued, the husband had relinquished to his wife all his interest in the damage action. Defendant contended that there could not be an *assignment* of a cause of action for personal injuries, to which this court replied at page 720:

"It is a rule universally recognized that one who is injured personally may not assign a claim growing out of such tort but there is some authority to the effect that almost every other kind of property is assignable. (*Rued* v. *Cooper,* 109 Cal. [682] 693, [34 Pac. 98].) However, the court found here *not an assignment* but a relinquishment of all the husband's claim to the community property. *If such remission as to further accretions before the cause of action would operate as a transmutation of the property into the wife's separate estate, we see no reason why the same result could not be attained by the same means after the cause of action came into existence.* It was therefore proper for the court to find with reference to the agreement which the plaintiffs made *after* the accident and before February 8, 1906." (Emphasis added.) While there is no finding in the instant case that the above quoted instrument is a relinquishment rather than an assignment, it is readily susceptible of that construction inasmuch as it states that the chose in action here involved "is the separate property" of plaintiff. It does not purport to be a present transfer, that is, an assignment. Rather, it is a recognition of an established status of the property as separate rather than community. Defendant contends that since the amendment in 1927 of section 161(a) of the Civil Code, a wife has a present, existing and equal interest in the community property, the cases decided under the former section, holding that she was competent as a witness in an action by her husband on a community claim against an estate are not pertinent here because they were based upon her lack of a present interest in the community claim. However, the Perkins case involved a transfer by a *husband* to his wife of his interest in such a claim, and unquestionably he had a vested interest in all community property at that time.

But even if it be assumed that error was committed in permitting her to testify, it was not prejudicial and did not constitute a miscarriage of justice. The evidence heretofore discussed as supporting the judgment all came from sources other than Mrs. Roy. Her testimony was merely cumulative, there being adequate evidence without it to support the judg-

ment. The case was tried before the court sitting without a jury. Defendant saving his objection by stipulation had opportunity to and did cross-examine Mrs. Roy. It has been held that under the proper circumstances where there is sufficient independent competent evidence to support the judgment without the erroneously admitted testimony of incompetent witnesses, such error is not prejudicial. (*Evans* v. *Gibson,* 220 Cal. 476 [31 P.2d 389] ; *Manford* v. *Coats,* 6 Cal.App.2d 743 [45 P.2d 395] ; *Gump* v. *McPherson,* 136 Cal.App. 778 [29 P.2d 893].)

The judgment is affirmed.

Shenk, J., and Schauer, J. pro tem., concurred.

Gibson, C. J., and Curtis, J., concurred in the judgment on the ground stated in the opinion that the admission of the evidence of the wife, even though erroneous, was not prejudicial.

TRAYNOR, J.—I dissent. Section 1880 of the Code of Civil Procedure provides: "The following persons cannot be witnesses: . . . 3. Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted, against an executor or administrator upon a claim, or demand against the estate of a deceased person, as to any matter or fact occurring before the death of such deceased person." The wisdom of such a statute has been a matter of controversy for so long that it may well be time for the Legislature to make a re-examination that will freshly evaluate the protection of estates from false claims and the ensuing risk of defeating just claims. (See Wigmore on Evidence (3d ed.) §§ 578, 1576, 2165.) In any event the section should be amended or repealed only by the Legislature. Its revision cannot properly be undertaken by the court, which could resort only to quibbles over words, as it does in the present case by labelling the agreement between the husband and wife a relinquishment rather than an assignment.

*Perkins* v. *Sunset Tel. & Tel.,* 155 Cal. 712 [103 P. 190], upon which the majority opinion relies, in no way concerned section 1880(3) of the Code of Civil Procedure. Moreover, ten years before the cause of action for the injuries to the wife arose the husband and wife agreed that all community

property acquired in the future should be the separate property of the wife, and the reference to the agreement succeeding the cause of action was therefore dictum unnecessary to the decision.

In the light of all the evidence it is not improbable that a different judgment would have been reached had the erroneously admitted evidence been excluded. Since the error is therefore prejudicial the judgment should be reversed.

Edmonds, J., concurred.